IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| CASEY EDWARD RATCLIFF, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. GLR-18-1650 |
| BALTIMORE COUNTY POLICE DEPARTMENT, et al., | * | |
| | * | |
| Defendants. | | |

*****

## MEMORANDUM OPINION

THIS MATTER is before the Court on Defendants the Baltimore County Police Department ("BCPD"), Lieutenant Craig Mitchell ("Lieutenant Mitchell"), Officer Christopher Stallings ("Officer Stallings"), and Office Darren Brusio's ("Officer Brusio") (collectively, without BCPD, "Officer Defendants") Motion to Dismiss or, in the Alternative, for Summary Judgment (ECF No. 17). The Motion is ripe for disposition, and no hearing is necessary. See Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant the Motion.

### I. BACKGROUND[1]

On March 13, 2018 at 1:07 a.m., Officer Jason Lentz ("Officer Lentz")[2] arrested Plaintiff Casey Edward Ratcliff at the Red Roof Inn in Timonium, Maryland. (Compl. at

---

[1] Unless otherwise noted, the facts outlined here are set forth in Ratcliff's Complaint (ECF No. 1). To the extent the Court discusses facts that Ratcliff does not allege in his Complaint, they are uncontroverted and the Court views them in the light most favorable to Ratcliff. The Court will address additional facts when discussing applicable law.

[2] Ratcliff does not name Officer Lentz as a Defendant in this case.

2, ECF No. 1; see also Defs.' Mot. Dismiss Summ. J. ["Defs.' Mot."] Ex. 1, ECF No. 17-5; Brusio Aff. ¶ 8, ECF No. 17-2).[3] Officer Lentz took Ratcliff to Precinct #7 in Cockeysville, Maryland for booking. (Brusio Aff. ¶ 8). An unspecified officer "handcuffed [Ratcliff] to a pipe" in the booking room. (Compl. at 3). The booking room was "very cold," but Ratcliff was not allowed to wear his coat, nor was he provided with a blanket. (Id.).

Officer Stallings, who was the booking and processing officer, informed Ratcliff that he was switching on his body camera before he uncuffed Ratcliff from the pipe. (Id.). Officer Stallings left shackles on his legs, despite Ratcliff's "large painful wounds on both legs from knee to ankle." (Id.). While he was standing for his mugshots, Ratcliff "began to feel very dizzy." (Id.). Ratcliff informed Stallings that he was dizzy and that he believed he was going to "pass out" or suffer a seizure and needed to sit down. (Id.). Officer Stallings "ordered [Ratcliff] to remain standing and continue in the process." (Id.). Ratcliff tried to comply and remained standing, but he "had to brace [himself] against the wall at least once." (Id.). Ratcliff again asked Officer Stallings if he could sit down and Officer Stallings ordered him to stay standing. (Id.).

Ratcliff "reluctantly" began the fingerprinting process. (Id. at 4). At the finger print scanning machine, Ratcliff told Officer Stallings that he was dizzy, he was going to fall, and he needed to sit, but Officer Stallings denied his request to sit down. (Id.). Ratcliff then "had a seizure while standing next to Officer Stallings and fell to the ground striking [his]

---

[3] Citations to the Complaint refer to the pagination the Court's Case Management and Electronic Case Files ("CM/ECF") system assigned.

head on the bare concrete floor." (Id.). Although he was close enough to Officer Stallings during fingerprinting for Officer Stallings to hold and control his hands to obtain the fingerprints, Officer Stallings made no attempt to catch him or cushion his fall, despite "ample and timely warnings of [Ratcliff's] imminent fall." (Id.). Lieutenant Mitchell entered the room to ask what had happened. (Id.). "[Officer] Stallings stated to [Lieutenant] Mitchell that [Ratcliff] had told him that [he] would fall and then [he] did." (Id.). Lieutenant Mitchell asked Officer Stallings whether he tried to catch Ratcliff, and Officer Stallings replied that he had not. (Id.).

Ratcliff "asked for medical attention and an ambulance was called." (Id.). Ratcliff's "head was throbbing" as he laid on the cold floor and he was "going in and out of consciousness" until he was transported by ambulance to the Greater Baltimore Medical Center ("GBMC") emergency room. (Id. at 4–5). Both of Ratcliff's legs remained shackled despite the pain the shackles caused to his leg wounds and his "requests to remove or adjust" them.[4] (Id. at 5). When Baltimore County Detention Center officers took Ratcliff into custody, they shackled only one of his legs to the hospital bed. (Id.). Ratcliff was hospitalized at GBMC for one week. (Id.). He now suffers "recurring headaches, neck pain, and pain in [his] shoulders" that he "did not have before this fall." (Id.).

On June 4, 2018, Ratcliff, proceeding pro se, filed a verified Complaint. (ECF No. 1). Ratcliff states that he "believe[s] [that his] civil rights were violated," but he does not state which ones. (Id.). He seeks "financial compensation for violation of [his]

---

[4] Ratcliff does not identify to whom he made these requests. (See Compl. at 5).

constitutional rights, negligence on the part of the police, and pain and suffering in the amount of 1 million dollars plus all related cost, fees, medical bills, etc." (Id. at 7).

On September 14, 2018, Defendants filed a Motion to Dismiss or, in the Alternative, for Summary Judgment. (ECF No. 17). Ratcliff filed an Opposition on September 21, 2019. (ECF No. 19). To date, the Court has no record that Defendants filed a Reply.

## II. DISCUSSION

**A.** **Conversion of Defendants' Motion**

Defendants style their Motion as a motion to dismiss under Rule 12(b)(6) or, in the alternative, for summary judgment under Rule 56. A motion styled in this manner implicates the Court's discretion under Rule 12(d). See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cty., 788 F.Supp.2d 431, 436–37 (D.Md. 2011), aff'd sub nom. Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., 684 F.3d 462 (4th Cir. 2012). Under Rule 12(d), when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6) ] motion must be treated as one for summary judgment under Rule 56." The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion. First, that the "parties be given some indication by the court that it is treating the 12(b)(6) motion as a motion for summary judgment" and second, "that the parties first 'be afforded a reasonable opportunity for discovery.'" Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Baltimore, 721 F.3d 264, 281 (4th Cir. 2013) (quoting Gay v. Wall, 761 F.2d 175, 177 (4th Cir. 1985)).

4

When the movant expressly captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005). "[T]he party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). Rule 56(d) provides that the Court may deny or continue a motion for summary judgment "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." "[T]he failure to file an affidavit under Rule 56[(d)] is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate." Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir. 1995) (quoting Paddington Partners v. Bouchard, 34 F.3d 1132, 1137 (2d Cir. 1994)).

Here, Ratcliff was on notice that the Court might resolve Defendants' Motion under Rule 56 because they styled their Motion in the alternative for summary judgment and presented extensive extra-pleading material for the Court's consideration. See Moret, 381 F.Supp.2d at 464. Ratcliff does not submit a Rule 56(d) affidavit, nor does he otherwise request additional time for discovery. Because the Court considers Defendants' extra-pleading materials in resolving Defendants' Motion, the Court construes their Motion as a motion for summary judgment.

**B.    Standard of Review**

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459,

465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

**C.      Analysis**

In his Complaint, Ratcliff alleges violations of unspecified constitutional rights, but he clarifies in his Opposition that he brings his claims under the Eighth and Fourteenth Amendments. Ratcliff also brings state law medical negligence claims. The Court first addresses Ratcliff's claims against BCPD.

**1.      Baltimore County Police Department**

Defendants argue that Ratcliff's claims against BCPD must be dismissed because BCPD, as a department within Baltimore County, is not an independent legal entity that may be sued in its own name. The Court agrees.

Maryland substantive law determines whether an entity possesses the legal capacity to be sued. See Chrysler Credit Corp. v. Superior Dodge, Inc., 538 F.2d 616, 617–18 (4th

Cir. 1976). Under § 9-201(2) of the Local Government Article of the Maryland Code, charter counties of Maryland, such as Baltimore County, may "sue and be sued." Section 103 of the Baltimore County Charter provides, in part: "The corporate name <u>shall</u> be 'Baltimore County, Maryland,' and it <u>shall</u> thus be designated in <u>all</u> actions and proceedings touching its rights, powers, properties, liabilities and duties." The BCPD is a department within Baltimore County government. Thus, BCPD is not amenable to suit in its own name. See <u>Farmer v. Baltimore Cty. Dep't of Corrs.</u>, No. CCB-11-2126, 2012 WL 3155650, at *3 (D.Md. July 31, 2012) ("The Baltimore County Department of Corrections is a department within Baltimore County's administrative structure and consequently not subject to suit in its own name."); see also <u>Ashburn v. Anne Arundel Cty.</u>, 510 A.2d 1078, 1079 (Md. 1986) (noting the circuit court had determined "Anne Arundel County Police Department was not a separate legal entity" subject to suit); <u>Cty. Council for Montgomery Cty. v. Supervisor of Assessments of Montgomery Cty.</u>, 332 A.2d 897, 901 (Md. 1975) ("County Council" is not a separate legal entity that can sue or be sued). The Court will, therefore, grant Defendants' Motion to the extent it seeks to dismiss BCPD as a Defendant.

   2.   **Officer Defendants**

Defendants raise two principle arguments for granting summary judgment in Officer Defendants' favor: (1) Ratcliff fails to establish a violation of his constitutional rights under either the Eighth Amendment or the Fourteenth Amendment; and (2) Ratcliff fails to establish a state law medical negligence claim.[5]

---

[5] Defendants also contend that Officer Defendants are entitled to public official immunity. Because the Court concludes that Ratcliff fails to establish his federal

8

### a. Federal Constitutional Claims

The Court evaluates claims of pretrial detainees, like Ratcliff, regarding conditions of confinement under the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment's proscription against cruel and unusual punishment. See Bell v. Wolfish, 441 U.S. 520, 535 & n.16 (1979); Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988). "The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment." Barnes v. Wilson, 110 F.Supp.3d 624, 629 (D.Md. 2015) (citing Bell, 441 U.S. at 535); see Brown v. Harris, 240 F.3d at 388 ("[T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law." (quoting Ingraham v. Wright, 430 U.S. 651, 671 n.40 (1977))).

### i. Deliberate Indifference to Medical Needs

A prison official violates a pretrial detainee's Fourteenth Amendment rights when the official is deliberately indifferent to the detainee's serious medical needs. See Young, 238 F.3d at 575 ("[D]eliberate indifference to the serious medical needs of a pretrial detainee violates the due process clause."); see also Hill v. Nicodemus, 979 F.2d 987, 991 (4th Cir. 1992) (adopting the standard of "deliberate indifference" with respect to the level of care owed to a pretrial detainee under the Fourteenth Amendment); Gordon v. Kidd, 971 F.2d 1087, 1094 (4th Cir. 1992) ("Pretrial detainees, like inmates under active sentence,

---

constitutional claims and, as a result, declines to exercise supplemental jurisdiction over his state law medical negligence claims, the Court does not address this argument.

are entitled to medical attention, and prison officials violate detainees' rights to due process when they are deliberately indifferent to serious medical needs."); Belcher v. Oliver, 898 F.2d 32, 34 (4th Cir. 1990) ("The Fourteenth Amendment right of pretrial detainees, like the Eighth Amendment right of convicted prisoners, requires that government officials not be deliberately indifferent to any serious medical needs of the detainee." (citing Martin, 849 F.2d 871)).

"The necessary showing of deliberate indifference can be manifested by prison officials in responding to a prisoner's medical needs in various ways, including intentionally denying or delaying medical care, or intentionally interfering with prescribed medical care." Formica v. Aylor, 739 F.App'x 745, 754 (4th Cir. 2018). Critical to the Court's inquiry are the two prongs of the deliberate indifference analysis. First, deliberate indifference to a serious medical need requires proof that, objectively, the plaintiff was suffering from a serious medical need. See Farmer v. Brennan, 511 U.S. 825, 837 (1984). Second, there must be proof that, subjectively, the defendant was aware of the need for medical attention but failed either to provide it or to ensure that the needed care was available. See id.

"[T]he objective component of an Eighth Amendment claim based on a deprivation of medical attention is satisfied only if the medical need of the prisoner is 'serious.'" Shakka v. Smith, 71 F.3d 162, 166 (4h Cir. 1995) (internal quotation marks omitted) (quoting Hudson v. McMillian, 503 U.S. 1, 8 (1992)). A serious medical need is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v.

Shreve, 535 F.3d 225, 241 (4th Cir. 2008) (quoting Henderson v. Sheahan, 196 F.3d 839, 846 (7th Cir. 1999)).

The subjective component requires a determination whether the defendant acted with "a sufficiently culpable state of mind." Wilson v. Seiter, 501 U.S.294, 298 (1991); see Farmer, 511 U.S. at 839–40. In order "[t]o show an Eighth Amendment violation, it is not enough that an official should have known of a risk; he or she must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Lightsey, 775 F.3d at 178. "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844).

Here, the evidence in the record reflects that Officers Brusio and Lentz were dispatched in separate police cars to the Red Roof Inn on March 13, 2018, after the Baltimore County 911 dispatch center received a report that Ratcliff was staying there. (Defs.' Mot. Ex. 2, ECF No. 17-6). Officer Brusio was the primary officer assigned to serve the arrest warrant on Ratcliff. (Brusio Aff. ¶ 9). Officer Lentz drove Ratcliff to Precinct #7. (Id. ¶ 8; see also Defs.' Mot. Ex. 1)

Officer Stallings assumed custody of Ratcliff for completing the arrest and booking procedure. (See Stallings Aff. ¶¶ 6–7, ECF No. 17-4). Officer Stallings activated his body camera while he read screening questions to Ratcliff; he did not activate his body camera when fingerprinting Ratcliff. (Id. ¶ 25). While Officer Stallings was photographing

11

Ratcliff, "Ratcliff said something about being 'dizzy' or 'falling.'" (Id. ¶ 8). Officer Stallings avers that he told Ratcliff that "he could sit down" or they "could get the photo and fingerprints done as quickly as possible so that he could sit down" and that Ratcliff "did not object to finishing the processing procedure." (Id. ¶ 9).

After Officer Stallings finished photographing Ratcliff, they moved to the live scan machine. (Id. ¶ 10). Officer Stallings states that he "had only scanned a couple of fingers when Mr. Ratcliff said he might fall. Immediately . . . and before I could react, his whole body moved forward very fast, he hit his head on the live scan[,] and then fell backward to the floor." (Id. ¶ 11). Officer Stallings avers that he "grabbed onto" Ratcliff as he fell to the floor, but that he "could not catch his full body weight." (Id. ¶ 12). Officer Stallings further avers that he saw Ratcliff fall and land "on his back and shoulders" and that he "did not strike his head on the floor." (Id.). Officer Stallings suspected Ratcliff "may have had a seizure," but observed no signs of a seizure after Ratcliff was on the floor. (Id. ¶ 13). Officer Stallings states that Ratcliff "did not exhibit any physical indication of a serious medical issue that would cause him to fall" and that Ratcliff "did not request any medical attention." (Id. ¶ 14). In addition, "Ratcliff did not speak or complain of any injury while he was lying on his side on the floor prior to the arrival of medical personnel" and Officer Stallings "did not observe and blood or injury to [Ratcliff's] head." (Id. ¶ 15). The desk officer "immediately called for a medic unit to respond" and Officer Brusio responded to assist Ratcliff "within seconds of the incident occurring." (Id. ¶ 17; Brusio Aff. ¶ 15). Officer Stallings placed a blanket under Ratcliff's head to make him more comfortable

12

until medical personnel arrived and also covered him with another blanket. (Stallings Aff. ¶ 19).

Officer Brusio states that at approximately 2:10 a.m. he heard a sound he describes as a "whoa" come from the prisoner processing room. (Brusio Aff. ¶ 11, ECF No. 17-2). Officer Brusio walked from his desk to the entrance of the prisoner processing room where he witnessed Ratcliff collapse in front of the fingerprinting machine. (Id. ¶¶ 11–12). Officer Brusio saw Ratcliff's lower body go down first and saw him fall on his back. (Id. ¶ 12). According to Officer Brusio, Ratcliff did not bang his head on the floor as Ratcliff contends. (Id.). Brusio avers that he observed no sign of injury to Ratcliff's head, nor did he hear him cry out in pain when he fell. (Id. ¶ 16). In addition, Officer Brusio states that, before Ratcliff fell, he "was not aware that [Ratcliff] had any medical issues that needed immediate treatment" and that Ratcliff "never asked [him] for medical treatment prior to his fall." (Id. ¶¶ 21–22) Officer Brusio states that he followed the ambulance to GBMC, stayed with Ratcliff in the emergency room until his shift was over, and, pursuant to BCPD policy, Ratcliff was leg-shackled and one arm was handcuffed to the bed railing. (Id. ¶ 18).

Lieutenant Mitchell also "heard a commotion" coming from the booking room at approximately 2:10 a.m. on March 13, 2018. (Mitchell Aff. ¶ 8, ECF No. 17-3). When Lieutenant Mitchell "immediately responded" to the booking area, he saw Ratcliff lying on the floor with Officer Stallings kneeling beside him. (Id. ¶ 9). He observed that the desk officer had called for an ambulance and that Ratcliff "was conscious and breathing." (Id. ¶¶ 12–13). Lieutenant Mitchell observed no blood or injury to Ratcliff's head. (Id. ¶ 15). According to Lieutenant Mitchell, Ratcliff never told him he needed medical

treatment and prior to Ratcliff's suspected seizure and fall, Mitchell not aware that Ratcliff had any medical issues. (Id. ¶¶ 17–18). Officer Stallings told Mitchell that while holding Ratcliff's hand and rolling his fingers on the fingerprinting machine, Ratcliff began to fall and that he held on to Ratcliff's arm to help him to the floor. (Id. ¶¶ 10–11). Paramedics transported Ratcliff from Precinct #7 at 2:35 a.m. on March 13, 2018. (Id. ¶¶ 12, 16).

Officers Stallings and Brusio completed the required BCPD Sick or Injured Form # 273 ("Form # 273") to document the incident. (Stallings Aff. ¶¶ 23–24; Brusio Aff. ¶ 20). Officer Stallings completed the top portion of the Form #273 while at the precinct. (Stallings Aff. ¶ 23; Brusio Aff. ¶ 19). On the portion of the form captioned "circumstances surrounding the injury/illness" Officer Stallings wrote: "Body started to shake then fell to the floor/assisted subject to the floor." (Stallings Aff. ¶ 24; Defs.' Mot. Ex. 4 ["Form #273"], ECF No. 17-8). Officer Brusio completed the bottom half of Form # 273 at the hospital, writing in the "Remarks" section: "Subject had large open wound to his lower right leg from previous motorcycle accident before being arrested. Accident occurred one year ago." (Brusio Aff. ¶ 20; Form #273).

The medical records the Emergency Medical Services ("EMS") responders who treated Ratcliff completed indicate that Ratcliff denied having any pain, "advised having felt lightheaded which was normal just prior to a seizure," and reported his last seizure was over a year previous despite being unmedicated. (Defs.' Mot. Ex. 3 ["EMS Report"] at 1, ECF No. 17-7). The EMS responders observed that Ratcliff's head and face were normal; the physical examination revealed no head trauma ("atraumatic") and his neurological

14

signs were normal. (Id. at 2). Ratcliff was alert and oriented to person, place and time, and his judgment and thought content was normal. (Id.).

The CT scan of Ratcliff's head performed at GBMC on March 13, 2018, found no acute intracranial abnormalities. (Defs.' Mot. Ex. 5 at 5, ECF No. 17-9). More specifically, the results revealed no evidence of "acute cortical infarction" or hemorrhage, mass effect or edema or skull fracture or acute or significant intracranial abnormalities. (Id.). Ratcliff's discharge records indicate that he was not prescribed treatment for a head injury. (See id.).

Ratcliff was, however, admitted to GBMC for chronic bilateral "infected chronic leg wounds and MRSA, E.Coli, and Pseudomonas," as a result of injuries he incurred a year before in a motorcycle accident. (Id. at 1, 5, 7). Ratcliff told medical staff that his wound had been treated two weeks before at another hospital, but that he had not complied with the recommendations to take oral antibiotics or follow up with IV antibiotics in the infusion clinic. (Id. at 5–6). GBMC treated Ratcliff's wounds, and he was discharged on March 18, 2018. (Id. at 1).

To establish that Officer Defendants acted with deliberate indifference, Ratcliff must show they were aware he was suffering from a serious medical need and failed either to provide or to ensure that the needed care was available. See Farmer, 511 U.S. at 837. Here, Ratcliff produces no evidence that he asked Officer Brusio or Lieutenant Mitchell for medical treatment or that either of them was aware that he had complained of dizziness. Nor were they aware of his leg wounds. (Brusio Aff. ¶¶ 21–22; Mitchell Aff. ¶¶ 17–18 (each stating he was unaware Ratcliff had any medical issues requiring treatment before the fall). Thus, Ratcliff fails to create a genuine dispute of material fact as to whether

Officer Brusio or Lieutenant Mitchell were aware of any serious medical need Ratcliff may have had.

Officer Stallings acknowledges that Ratcliff said something to him about being dizzy when he was being photographed. Officer Stallings avers that he gave Ratcliff the option of sitting down or finishing the process as quickly as possible, to which Ratcliff expressed no objection.[6] Ratcliff acknowledges that he "reluctantly began the process of fingerprinting." (Compl. at 4). Prior to falling, however, Ratcliff had not exhibited any serious medical issues that needed immediate attention, nor had he requested medical attention from Officer Stallings. (Stallings Aff. ¶ 14). After Ratcliff fell and his need for immediate medical need became known, the desk officer at Precinct #7 called 911 for an ambulance. Further Officer Stallings covered Ratcliff with a blanket and provided another blanket to cushion his head and neck, and stayed with him until emergency medical providers arrived to transport him to the hospital. Such facts do not support a claim of deliberate indifference.

In his Opposition, which Ratcliff does not support with exhibits or affidavits, Ratcliff asserts that Officer Defendants' Affidavits contradict one another, and that his case should proceed to trial. Ratcliff observes that Officer Stallings stated in his Affidavit that he grabbed on to Ratcliff as he went to the ground; whereas Lieutenant Mitchell states in his Affidavit that Officer Stallings had told him that Ratcliff "just fell or went down." (Pl.'s

---

[6] In his verified Complaint and unverified Opposition, Ratcliff disputes this fact, stating that Officer Stallings ordered him to remain standing. (Compl. at 4; Pls.' Opp'n ¶ 4B, ECF No. 19). This factual dispute is not material, however, to whether Officer Stallings was aware that Ratcliff had an objectively serious medical condition.

Opp'n ¶ 4C). Ratcliff notes that Officer Brusio made no mention of Officer Stallings helping or cushioning him from the fall. But the variations in the Affidavits do not create a genuine dispute of material fact as to whether Officer Defendants were aware of Ratcliff's serious medical needs prior to his fall. Moreover, there is objective evidence to support Officer Stallings' and Officer Brusio's accounts; the hospital report found no evidence to support Ratcliff's claim he suffered a head injury. Further, Officer Stallings' ineffective attempt or lack of attempt to break Ratcliff's fall stops far short of demonstrating the reckless disregard required to satisfy the subjective standard for deliberate indifference.

In sum, viewing the facts in the light most favorable to Ratcliff, he fails to meet his burden to show that Officer Defendants acted with deliberate indifference to his serious medical needs. Accordingly, the Court will grant Defendants' Motion as to this claim.

### ii.  Excessive Force Claim

Construing his Complaint liberally, as the Court is obligated to do for pro se litigants like Ratcliff, he also alleges a constitutional claim under the Fourteenth Amendment for the use of the shackles around his legs. Ratcliff's claim regarding the shackles also fails for at least three reasons.

First, Ratcliff does not identify the police officer who allegedly shackled him at the precinct. Officer Stallings, who was booking officer, denies shackling Ratcliff's legs and states further that he was unaware of his leg wounds prior to Ratcliff completing his screening questions. (Stallings Aff. ¶ 16). Ratcliff does not present any evidence to rebut Officer Stallings' assertions. Second, Ratcliff does not identify to whom he directed his request for an adjustment of his shackles at GBMC. Officer Brusio states that Ratcliff was

17

shackled and handcuffed at GBMC in compliance with BCPD policy. Third, to the extent Ratcliff suggests his shackling amounted to excessive force in violation of his rights under the Fourteenth Amendment, he does not allege, nor does he provide evidence of Officer Defendants' express intent to punish him or that the restriction was not reasonably related to a legitimate nonpunitive governmental objective. See Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473–74 (2015) (noting that a "pretrial detainee can prevail by providing only objective evidence that the challenged governmental action is not rationally related to a legitimate governmental objective or that it is excessive in relation to that purpose"). The rational objectives, which the Court infers from the evidence in the record, are to protect hospital patients and employees and to prevent an inmate's escape inmate.

Under these circumstances, even when the facts are viewed in the light most favorable to Ratcliff, he fails to meet his burden to establish that Officer Defendants unlawfully inflicted punishment. Accordingly, the Court will grant Defendants' Motion as to this claim.

### b. Medical Negligence Claims

"Federal courts are courts of limited jurisdiction." Home Buyers Warranty Corp. v. Hanna, 750 F.3d 427, 432 (4th Cir. 2014) (quoting Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994)). There are three principal bases for subject-matter jurisdiction in federal court: (1) federal-question jurisdiction[7]; (2) diversity jurisdiction; (3) and supplemental jurisdiction. Typically, federal courts retain jurisdiction over state claims

---

[7] See 28 U.S.C. § 1331 (2018).

based on diversity jurisdiction, which exists when there is an amount in controversy exceeding $75,000, exclusive of interests and costs, and complete diversity of citizenship. See 28 U.S.C. § 1332(a) (2018).

District courts may also retain jurisdiction over state claims based on the doctrine of supplemental jurisdiction. Under this doctrine, when a district court has original jurisdiction, it will also have jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (2018). District courts may decline to exercise supplemental jurisdiction over a state claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3) (2018). District courts "enjoy wide latitude" in making this determination. Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995). When "the federal claim is dismissed early in the case, the federal courts are inclined to dismiss the state law claims without prejudice rather than retain supplemental jurisdiction." Carnegie Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988) (citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 726–27 (1966)).

Here, because the Court will dismiss all of Ratcliff's § 1983 claims—the claims over which it has original jurisdiction—the Court declines to exercise supplemental jurisdiction over his state law claims. Accordingly, the Court will dismiss Ratcliff's state law medical negligence claims without prejudice. He may re-file them in state court if he so chooses.

## III. CONCLUSION

For the foregoing reasons, the Court will grant Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment, construed as a motion for summary judgment. The Court will dismiss Ratcliff's state law claims without prejudice. A separate Order follows.

<u>August 6, 2019</u>　　　　　　　　　_____/s/_____
Date　　　　　　　　　　　　　　George L. Russell, III
　　　　　　　　　　　　　　　　United States District Judge